*PRELIMINARY PRINT*

VOLUME 605 U. S. PART 2

PAGES 335–359

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 12, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

A. J. T., BY AND THROUGH HER PARENTS, A. T., ET AL. *v.*
OSSEO AREA SCHOOLS, INDEPENDENT SCHOOL
DISTRICT NO. 279, ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE EIGHTH CIRCUIT

No. 24–249.   Argued April 28, 2025—Decided June 12, 2025

Multiple federal laws afford protections for children with disabilities in
public schools.   Three statutory schemes are particularly relevant to
this case.   Section 504 of the Rehabilitation Act of 1973 provides that
no qualified individual with a disability shall be excluded from participa-
tion in, denied the benefits of, or subjected to discrimination under any
federally funded program solely by reason of her or his disability.   Simi-
larly, Title II of the Americans with Disabilities Act (ADA) prohibits
qualified individuals with disabilities from being excluded from or de-
nied the benefits of a public entity's services, programs, or activities by
reason of disability.   While the antidiscrimination guarantees of Section
504 and Title II apply in a variety of contexts, the Individuals with
Disabilities Education Act (IDEA) offers federal funds to States in ex-
change for the commitment to furnish the core guarantee of a "free
appropriate public education" to children in public schools with certain
physical or intellectual disabilities.   The centerpiece of the IDEA is
the provision of an "individualized educational program," (IEP) which
"spells out" a plan to meet all of the educational needs of a child with a
qualifying disability.   *Fry* v. *Napoleon Community Schools*, 580 U. S.
154, 158.

Petitioner A. J. T. is a teenage girl with a rare form of epilepsy that
severely limits her physical and cognitive functioning.   She suffers from
seizures that are so frequent in the mornings that she cannot attend
school before noon, though she is alert and able to learn from noon until
6 p.m.   For the first few years of her schooling, school officials accommo-
dated A. J. T.'s condition by permitting her to avoid morning activities
and instead receive evening instruction.   But when A. J. T.'s family
moved to Minnesota in 2015, her new school district—Osseo Area Public
Schools, Independent District No. 279—denied her parents' repeated
requests to include evening instruction in A. J. T.'s IEP.   Between 2015
and 2018, A. J. T. received only 4.25 hours of instruction daily compared
to the typical 6.5-hour school day for nondisabled students in the dis-
trict.   After even further cuts to A. J. T.'s school day were proposed,
her parents filed an IDEA complaint with the Minnesota Department

of Education, alleging that the school's refusal to provide afterhours
instruction denied A. J. T. a free appropriate public education.   An Ad-
ministrative Law Judge determined that the school district had vio-
lated the IDEA and ordered the school to provide compensatory educa-
tion and evening instruction.   Federal courts subsequently affirmed
A. J. T.'s IDEA victory.

   A. J. T. and her parents then sued under the ADA and the Rehabilita-
tion Act, requesting a permanent injunction, reimbursement for certain
costs, and compensatory damages.   The District Court granted sum-
mary judgment for the school, and the Eighth Circuit affirmed.   In so
holding, the Eighth Circuit stated that a school district's failure to pro-
vide a reasonable accommodation was not enough to state a prima facie
case of discrimination under *Monahan* v. *Nebraska*, 687 F. 2d 1164,
which requires a plaintiff to prove conduct by school officials rising to
the level of bad faith or gross misjudgment.

*Held*: Schoolchildren bringing ADA and Rehabilitation Act claims related
   to their education are not required to make a heightened showing of
   "bad faith or gross misjudgment" but instead are subject to the same
   standards that apply in other disability discrimination contexts.
   Pp. 344–351.

   (a) Outside the educational services context, courts of appeals permit
plaintiffs to establish violations and obtain injunctive relief under the
ADA and Rehabilitation Act without proving intent to discriminate.
To obtain compensatory damages, courts generally require a showing of
intentional discrimination, which most circuits find satisfied by "deliber-
ate indifference"—a standard requiring only a showing that the defend-
ant disregarded a strong likelihood that the challenged action would
violate federally protected rights.   Nothing in the text of the applicable
substantive protections or remedial provisions of Title II of the ADA
or Section 504 of the Rehabilitation Act suggests that claims based on
educational services should be subject to a distinct, more demanding
analysis.   Pp. 344–345.

   (b) Some courts, however, have come to apply a heightened intent
standard to ADA and Rehabilitation Act claims in the educational serv-
ices context.   This standard traces back to the "bad faith or gross mis-
judgment" rule articulated by the Eighth Circuit in its 1982 decision in
*Monahan*, in which the Eighth Circuit reasoned that to prove discrimi-
nation under the Rehabilitation Act in the educational context, a plain-
tiff must show "something more than a mere failure to provide" a free
appropriate public education.   687 F. 2d, at 1170.   The court explained
a heightened showing of bad faith or gross misjudgment was necessary

to "harmonize" the Rehabilitation Act and the IDEA and to reflect the proper balance between disabled children's rights, state officials' responsibilities, and courts' competence in technical fields. *Id.*, at 1171.

In *Smith* v. *Robinson*, 468 U. S. 992, this Court similarly tried to "harmonize" the IDEA's specific guarantee of a free appropriate public education with the protections of other antidiscrimination laws, ultimately concluding that the IDEA's comprehensive statutory scheme was the exclusive avenue by which a disabled child or his parents could challenge the adequacy of his education. Within two years, however, Congress enacted a new provision of the IDEA overturning *Smith*. That provision, now codified at 20 U. S. C. § 1415(*l*), provides that nothing in the IDEA "shall be construed to restrict or limit the rights, procedures, and remedies available under" the ADA, Rehabilitation Act, or other federal laws protecting disabled children's rights. This provision makes clear that the IDEA does not restrict or limit rights or remedies that other federal antidiscrimination statutes independently confer on children with disabilities. The bad faith or gross misjudgment rule derived from *Monahan* is irreconcilable with the unambiguous directive of § 1415(*l*). In imposing a higher bar for discrimination claims based on educational services as compared to other sorts of disability discrimination claims, the Eighth Circuit effectively read the IDEA to implicitly limit the ability of disabled schoolchildren to vindicate their independent ADA and Rehabilitation Act rights, thereby making it more difficult to secure the statutory remedies provided by Congress. Pp. 345–349.

(c) The school district no longer defends *Monahan*'s asymmetric rule, and contends instead that bad faith or gross misjudgment is the correct standard of intent for all ADA and Rehabilitation Act claims, whether in or out of schools. This argument was not resolved below, was not raised in the brief in opposition to certiorari, and is outside the question presented. The Court declines the invitation to inject into this case significant issues that have not been fully presented. Pp. 349–351.

96 F. 4th 1058, vacated and remanded.

ROBERTS, C. J., delivered the opinion for a unanimous Court. THOMAS, J., filed a concurring opinion, in which KAVANAUGH, J., joined, *post*, p. 351. SOTOMAYOR, J., filed a concurring opinion, in which JACKSON, J., joined, *post*, p. 355.

*Roman Martinez* argued the cause for petitioner. With him on the briefs were *Peter A. Prindiville*, *Nicholas Rosellini*, and *Amy J. Goetz*.

*Nicole Frazer Reaves* argued the cause for the United States as *amicus curiae* urging vacatur. With her on the brief were *Deputy Solicitor General Gannon*, *Acting Assistant Attorney General Roth*, *Deputy Assistant Attorney General Warner*, *Deputy Solicitor General Stewart*, *Sydney A. R. Foster*, *Ellen Noble*, *Charles W. Scarborough*, *Catherine Padhi*, and *Thomas Wheeler*.

*Lisa S. Blatt* argued the cause for respondents. With her on the brief were *Charles L. McCloud*, *Aaron Z. Roper*, *Laura Tubbs Booth*, *Christian R. Shafer*, and *Adam J. Frudden*.*

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Petitioner A. J. T. is a teenage girl who suffers from a rare form of epilepsy that severely limits her physical and cognitive functioning. When school administrators denied her certain educational accommodations, A. J. T.'s parents sued the school district, alleging discrimination on the basis of disability. The courts below held that A. J. T.'s claims could not go forward because she had not shown that school officials acted with "bad faith or gross misjudgment." That standard, the courts explained, applies uniquely in the educational services context and requires a more demanding show-

——————

*Briefs of *amici curiae* urging reversal were filed for the Council of Parent Attorneys and Advocates et al. by *Brian Wolfman*, *Regina Wang*, and *Selene A. Almazan-Altobelli*; and for Rep. Tony Coelho et al. by *David A. Strauss*, *Sarah M. Konsky*, and *Matthew S. Hellman*.

A brief of *amici curiae* urging affirmance was filed for the State of Tennessee et al. by *Jonathan Skrmetti*, Attorney General of Tennessee, *J. Matthew Rice*, Solicitor General, *Whitney D. Hermandorfer*, and *Virginia N. Adamson*, Assistant Solicitor General, and by the Attorneys General for their respective States as follows: *Tim Griffin* of Arkansas, *James Uthmeier* of Florida, *Raúl Labrador* of Idaho, *Aaron M. Frey* of Maine, *Lynn Fitch* of Mississippi, and *Ken Paxton* of Texas.

*Sonja H. Trainor* and *W. Stuart Stuller* filed a brief for AASA, The School Superintendents Association et al. as *amici curiae*.

ing compared to other sorts of disability discrimination claims. We consider whether the courts below were right to require this heightened showing.

## I

### A

Multiple federal laws afford "diverse" (and occasionally overlapping) protections for children with disabilities in public schools. *Fry* v. *Napoleon Community Schools*, 580 U. S. 154, 170 (2017); see *id.*, at 170–171. Three are particularly relevant to this case. Beginning with two broadly applicable such laws, both Section 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U. S. C. § 794, and Title II of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 337, as amended, 42 U. S. C. § 12131 *et seq.*, prohibit discrimination on the basis of disability in a wide variety of contexts. See *Fry*, 580 U. S., at 159. Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U. S. C. § 794(a). Similarly, under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U. S. C. § 12132. Both Section 504 and Title II "authorize individuals to seek redress for violations of their substantive guarantees by bringing suits for injunctive relief or money damages." *Fry*, 580 U. S., at 160; see 29 U. S. C. § 794a(a)(2); 42 U. S. C. § 12133.

Beyond these generally applicable antidiscrimination laws, the Individuals with Disabilities Education Act (IDEA), 84 Stat. 175, as amended, 20 U. S. C. § 1400 *et seq.*, "offers federal funds to States in exchange for a commitment: to fur-

nish" the core guarantee of a " 'free appropriate public education' . . . to all children with certain physical or intellectual disabilities." *Fry,* 580 U. S., at 158 (quoting § 1412(a)(1)(A)).[1] To that end, once a State accepts the IDEA's financial assistance, it must provide " 'special education and related services,' " including " 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Id.*, at 158 (quoting §§ 1401(9), (26), (29)).

The IDEA's "primary vehicle for implementing these congressional goals is the 'individualized educational program' (IEP)." *Honig* v. *Doe*, 484 U. S. 305, 311 (1988). An IEP "spells out" for each child with a qualifying disability "a personalized plan to meet all of the child's 'educational needs.' " *Fry*, 580 U. S., at 158 (quoting § 1414(d)(1)(A)(i)(II)(bb)). It is developed through a collaborative process between a child's parents, teachers, and school officials. See *id.*, at 158. But since "parents and school representatives sometimes cannot agree" on all aspects of an IEP, "the IDEA establishes formal procedures for resolving disputes," starting with administrative review in a local or state educational agency, followed by the availability of judicial review in state or federal court. *Id.*, at 159.

B

Petitioner A. J. T. "requires assistance with everyday tasks like walking and toileting," and suffers from seizures throughout the day that create safety concerns and interfere with her capacity to learn. 96 F. 4th 1062, 1064 (CA8 2024); see App. 515. Although A. J. T.'s seizures are so frequent in the morning that she "can't attend school before noon,"

---

[1] The IDEA was previously called "the Education of the Handicapped Act." *Fry* v. *Napoleon Community Schools*, 580 U. S. 154, 160, n. 1 (2017). Congress renamed the law in 1990. See *ibid.* We refer to the statute and its predecessor versions as the IDEA throughout this opinion.

she is "alert and able to learn" from noon until about 6 p.m.
96 F. 4th, at 1064.[2]

For the first few years of her schooling, A. J. T.'s parents
and educators accommodated her condition by permitting
her to avoid activities before midday and to receive evening
instruction at home. See *ibid.* That changed in 2015 when
A. J. T., then ten years old, moved with her family to Minne-
sota. A. J. T.'s new school district, Osseo Area Public
Schools, Independent School District No. 279, denied her par-
ents' repeated requests to include evening instruction in her
IEP. See *ibid.* As a result, between 2015 and 2018, A. J. T.
received 4.25 hours of instruction each day, as compared to
the typical 6.5 hour school day for other students. *Ibid.*; No.
21–cv–1760 (D Minn., Feb. 1, 2023), App. to Pet. for Cert. 8a.

In 2018, as the district prepared for A. J. T. to enter middle
school, it proposed further cutting back the length of her
school day. 96 F. 4th, at 1064. A. J. T.'s parents again
requested that she receive evening instruction and school-
ing hours comparable to her nondisabled peers. See *ibid.*
School administrators again denied those requests, and also
rejected proposals to maintain at least the same length in-
structional day that A. J. T. had been receiving in elementary
school. *Ibid.*

"Realizing that an agreement was beyond reach," A. J. T.'s
parents filed an IDEA complaint with the Minnesota Depart-
ment of Education, alleging that the school's refusal to pro-
vide afterhours instruction denied A. J. T. a free appropriate
public education. See *id.*, at 1064–1065. After a five day
evidentiary hearing, an Administrative Law Judge deter-
mined that the district had violated the IDEA. *Id.*, at 1065.
The judge ordered the school to provide several hundred

---

[2] Because this case comes to us on review of respondents' motion for
summary judgment, we view the evidence in the light most favorable to
A. J. T. *Tolan* v. *Cotton*, 572 U. S. 650, 657 (2014) (*per curiam*).

hours of compensatory education and "add certain services to [A. J. T.'s] IEP, including at-home instruction from 4:30 p.m. to 6:00 p.m. each school day." *Ibid.*

The school district sought judicial review, and a Federal District Court affirmed. 2022 WL 4226097, *21 (Minn., Sept. 13, 2022). The court agreed with the agency that school officials' "steadfas[t] refus[al]" to provide A. J. T. evening instruction, and "shifting reasons" for doing so, were based not on A. J. T.'s needs but on concerns of "[a]dministrative convenience"—namely, maintaining "the regular hours of the faculty." *Id.*, at *1, *13. The Eighth Circuit subsequently affirmed A. J. T.'s IDEA victory, agreeing with the District Court that the evidence showed that the school district's "choice to prioritize its administrative concerns had a negative impact on A. J. T.'s learning" and that she "would have made more progress with evening instruction." 96 F. 4th, at 1067.

## C

A. J. T. and her parents then sued the school district and the Osseo School Board (collectively, the District) in federal court, alleging violations of Title II of the ADA and Section 504 of the Rehabilitation Act. See App. 28–29. They requested a permanent injunction, reimbursement for certain costs, and compensatory damages. *Ibid.*

The trial court granted the District's motion for summary judgment. It acknowledged that A. J. T. is a "qualified individual with a disability" who "was denied the same length school day as her nondisabled peers based on her disability." App. to Pet. for Cert. 20a. But the court held that A. J. T. failed to state a prima facie case under Section 504 or the ADA because she did not show that school officials "acted with bad faith or gross misjudgment." *Id.*, at 35a–36a.

The Eighth Circuit affirmed. 96 F. 4th 1058, 1060 (2024). It explained that, under Circuit precedent, when "alleged ADA and Section 504 violations are 'based on educational

services for disabled children,' a school district's simple failure to provide a reasonable accommodation is not enough to trigger liability." *Id.*, at 1061 (quoting *B. M.* v. *S. Callaway R–II School Dist.*, 732 F. 3d 882, 887 (CA8 2013)). Rather, "a plaintiff must prove that school officials acted with 'either bad faith or gross misjudgment,' which requires '"something more" than mere non-compliance with the applicable federal statutes.'" 96 F. 4th, at 1061 (first quoting *Monahan* v. *Nebraska*, 687 F. 2d 1164, 1171 (CA8 1982); then quoting *B. M.*, 732 F. 3d, at 887; citation omitted). The panel explained that, while "A. J. T. may have established a genuine dispute about whether the district was negligent or even deliberately indifferent," under the Eighth Circuit's controlling standard, "that's just not enough." 96 F. 4th, at 1061. Since A. J. T. "failed to identify conduct" rising to the level of bad faith or gross misjudgment, the court said it was "constrained to hold that summary judgment was proper." *Ibid.* The panel itself, however, went on to question why the Eighth Circuit imposes "such a high bar for claims based on educational services," when it "require[s] much less in other disability-discrimination contexts." *Ibid.*, n. 2 (citing cases requiring "no intent" for a "failure-to-accommodate claim" and "deliberate indifference" for damages). "The answer," the panel said, "is a lesson in why '[w]e do not . . . add provisions to . . . federal statute[s].'" *Ibid.* (quoting *Alabama* v. *North Carolina*, 560 U. S. 330, 352 (2010); alterations in original). The Circuit's "bad faith or gross misjudgment rule," the panel opined, added "without any anchor in statutory text . . . a judicial gloss on Section 504," based on "speculat[ion] that Congress intended the IDEA's predecessor to limit Section 504's protections." 96 F. 4th, at 1062, n. 2 (citing *Monahan*, 687 F. 2d, at 1170–1171). The panel observed that this rule had "spread like wildfire" in the lower courts, although it "ha[d] been questioned" along the way. 96 F. 4th, at 1062, n. 2. And since the rule "remain[ed] the law"

in the Eighth Circuit, the panel was bound to follow it.    *Ibid.*
A. J. T.'s petition for rehearing en banc was denied, with
three judges dissenting.    App. to Pet. for Cert. 44a–45a.

We granted certiorari to resolve the disagreement in the
Courts of Appeals over whether schoolchildren bringing
ADA and Rehabilitation Act claims relating to their educa-
tion must make this heightened showing of "bad faith or
gross misjudgment."    604 U. S. 1096 (2025).[3]

## II

## A

Outside the context of elementary and secondary educa-
tion, the Eighth Circuit—in line with the general approach
of the courts of appeals—permits plaintiffs to establish a
statutory violation and obtain injunctive relief under the
ADA and Rehabilitation Act without proving intent to dis-
criminate.    See, *e. g., Hall* v. *Higgins*, 77 F. 4th 1171, 1180–
1181 (CA8 2023); *Midgett* v. *Tri-County Metropolitan Transp.
Dist. of Ore.*, 254 F. 3d 846, 851 (CA9 2001).    To obtain com-
pensatory damages, however, courts of appeals generally
agree that a plaintiff must show intentional discrimination.
See *Hall*, 77 F. 4th, at 1181; see also *S. H.* v. *Lower Merion
School Dist.*, 729 F. 3d 248, 262 (CA3 2013) (collecting cases).
On that score, "a majority" of the Courts of Appeals to have
weighed in on the question—including the Eighth Circuit—
find the requirement to show "intentional discrimination"
satisfied by proof that the defendant acted with "deliberate
indifference."    *Id.*, at 262–263.[4]    That standard "does not

---

[3] Compare *I. Z. M.* v. *Rosemount–Apple Valley–Eagan Public Schools*,
863 F. 3d 966, 973, n. 6 (CA8 2017) (collecting cases applying this stand-
ard to "alleged discrimination regard[ing] the education of disabled stud-
ents"), with, *e. g., D. E.* v. *Central Dauphin School Dist.*, 765 F. 3d 260,
269 (CA3 2014) (applying deliberate indifference standard for compensatory
damages).

[4] Lower courts appear to have derived this standard from our caselaw
applying Title IX (which, like the Rehabilitation Act and ADA, was "mod-
eled after Title VI").    *Gebser* v. *Lago Vista Independent School Dist.*, 524

require a showing of personal ill will or animosity toward the disabled person." *Meagley* v. *Little Rock*, 639 F. 3d 384, 389 (CA8 2011). Rather, to show deliberate indifference, it is enough that a plaintiff prove the defendant disregarded a "strong likelihood" that the challenged action would "result in a violation of federally protected rights." *Ibid.*

We hold today that ADA and Rehabilitation Act claims based on educational services should be subject to the same standards that apply in other disability discrimination contexts. Nothing in the text of Title II of the ADA or Section 504 of the Rehabilitation Act suggests that such claims should be subject to a distinct, more demanding analysis. The substantive provisions of both Title II and Section 504, by their plain terms, apply to "qualified individual[s]" with disabilities. 29 U. S. C. §794(a); 42 U. S. C. §12132. There is no textual indication that the protections of either disability discrimination statute apply with lesser force to *certain* qualified individuals bringing *certain* kinds of claims.

Nor do the applicable remedial provisions suggest any such distinction. Both Title II and Section 504 make the "remedies, procedures, and rights" provided therein available to "any person." 29 U. S. C. §794a(a)(2) ("any person aggrieved"); 42 U. S. C. §12133 ("any person alleging discrimination"). That language is expansive and unqualified, confirming applicability to *every* such person, "without distinction or limitation." *SAS Institute Inc.* v. *Iancu*, 584 U. S. 357, 363 (2018) (quoting Oxford English Dictionary (3d ed., Mar. 2016)).

How, then, did some courts of appeals come to apply a heightened intent standard to ADA and Rehabilitation Act claims concerning educational opportunities? The bad faith or gross misjudgment rule traces to the Eighth Circuit's opinion in *Monahan* v. *Nebraska*, 687 F. 2d 1164. See 96 F. 4th, at 1061, n. 2. There the Eighth Circuit—in a case in-

---

U. S. 274, 286, 290 (1998); see also Brief for United States as *Amicus Curiae* 15–20.

volving an IDEA claim and a Rehabilitation Act claim alleging "improper educational placement"—explained its view that "in order to show a violation of the Rehabilitation Act, something more than a mere failure to provide" the free appropriate public education "required by [the IDEA] must be shown." *Monahan*, 687 F. 2d, at 1169–1170. That "something more," the Eighth Circuit said, is "bad faith or gross misjudgment," which in its view "should be shown before a § 504 violation can be made out, at least in the context of education of handicapped children." *Id.*, at 1170–1171.[5]

The Eighth Circuit explained that the bad faith or gross misjudgment "standard of liability" was consistent with its "duty to harmonize the Rehabilitation Act and the [IDEA] to the fullest extent possible, and to give each of these statutes the full play intended by Congress." *Id.*, at 1171. The court also concluded that this standard "reflect[ed] . . . a proper balance between the rights of handicapped children, the responsibilities of state educational officials, and the competence of courts to make judgments in technical fields." *Ibid.* ("So long as the state officials involved [did not] depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under § 504.").

B

The *Monahan* court was not alone in its instinct to try to "harmonize" the IDEA's specific guarantee of a free appropriate public education, on the one hand, with more broadly applicable antidiscrimination laws, on the other. Indeed, just two years later in *Smith* v. *Robinson*, 468 U. S. 992 (1984), this Court applied virtually identical reasoning to hold that the IDEA was " 'the exclusive avenue' through which a child with a disability (or his parents) could chal-

---

[5] The Eighth Circuit subsequently extended this standard to education related claims brought under the ADA. See *Hoekstra* v. *Independent School Dist. No. 283*, 103 F. 3d 624, 626–627 (1996).

Opinion of the Court

lenge the adequacy of his education." *Fry*, 580 U. S., at 160 (quoting *Smith*, 468 U. S., at 1009).

The plaintiffs in *Smith* sued a school district under the IDEA "to secure a 'free appropriate public education'" for their handicapped child, *id.*, at 994, and "appended" to their complaint "virtually identical claims . . . under § 504 of the Rehabilitation Act," *Fry*, 580 U. S., at 160 (internal quotation marks omitted). In "consider[ing] the interaction between" the two statutes, *ibid.*, the *Smith* Court looked to "the comprehensive nature of the procedures and guarantees" set out in the IDEA, which the Court thought evinced "Congress' express efforts to place on local and state educational agencies the primary responsibility for developing a plan to accommodate the needs of each individual handicapped child," 468 U. S., at 1011; see *id.*, at 1016. In light of this "comprehensive scheme," this Court found it "difficult to believe that Congress also meant to leave undisturbed the ability of a handicapped child to go directly to court" with a Rehabilitation Act claim. *Id.*, at 1009, 1011, 1016. Such a result, the Court said, would effectively permit a plaintiff "to circumvent" and "render superfluous most of the detailed procedural protections outlined" in the IDEA. *Id.*, at 1011–1012. And "more important, it would also run counter to Congress' view that the needs of handicapped children are best accommodated" through the IDEA's "carefully tailored scheme." *Id.*, at 1012.

Congress apparently did not agree. Within two years, it enacted a new provision of the IDEA, "overturn[ing]" *Smith* and "'reaffirm[ing] the viability' of federal statutes like the ADA or Rehabilitation Act 'as separate vehicles,' no less integral than the IDEA, 'for ensuring the rights of handicapped children.'" *Fry*, 580 U. S., at 161 (quoting H. R. Rep. No. 99–296, pp. 4, 6 (1985)). Now codified at 20 U. S. C. § 1415(*l*), that provision states in relevant part:

> "Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available

under the Constitution, the [ADA], title V of the Rehabilitation Act [including § 504], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures shall first be exhausted]."

The plain text of § 1415(*l*) accordingly "makes clear that nothing in the IDEA 'restrict[s] or limit[s] the rights [or] remedies' that other federal laws, including antidiscrimination statutes, confer on children with disabilities." *Fry*, 580 U. S., at 157 (quoting 20 U. S. C. § 1415(*l*)). And that explicit edict applies "even" to a plaintiff who—"as in *Smith* itself"— seeks relief "that is also available under" the IDEA. *Fry*, 580 U. S., at 161.

In imposing a higher "bar for claims based on educational services" as compared to "other disability-discrimination contexts," however, the Eighth Circuit in *Monahan* effectively read the IDEA to implicitly limit the ability of children with disabilities to vindicate their independent ADA and Rehabilitation Act rights. 96 F. 4th, at 1061–1062, n. 2 (recognizing that Congress "rejected *Monahan*'s premise" in enacting § 1415(*l*)). And the court thereby made it more difficult for disabled schoolchildren to secure the statutory remedies provided by Congress in Title II and Section 504. That approach is irreconcilable with the unambiguous directive of § 1415(*l*).[6]

The District maintains that *Monahan*'s rule survives § 1415(*l*). That is so, it says, because the Eighth Circuit derived the bad faith or gross misjudgment standard based solely on *Section 504*'s text, rather than anything to do with

---

[6] Because we address only the application of the heightened bad faith or gross misjudgment standard of intent to education related ADA and Rehabilitation Act claims, our opinion should not be read to speak to any other showing that a plaintiff must make in order to prove a violation of the respective requirements of those statutes or the IDEA.

the IDEA. Brief for Respondents 24–25. The District insists that the court's statements that its chosen standard best harmonized and gave full play to the two statutes, while also balancing the interests of disabled schoolchildren and state educational officials, were mere observations of "the salutary policy benefits" of an analysis otherwise driven by the text of Section 504. *Id.,* at 25. And the court's repeated references to education of "handicapped children," it says, were simply descriptions of the "fact pattern at hand"—not suggestions that the bad faith or gross misjudgment standard should apply *only* in that context. *Id.,* at 24.

The District's reading of *Monahan* is difficult to square with what that opinion said. The *Monahan* court's discussion of Section 504 was inextricably bound with concomitant references to the IDEA. And its reasoning, at bottom, was grounded—much like this Court's in *Smith*—in an effort to strike what it believed was the appropriate balance between the two statutes. See *Monahan,* 687 F. 2d, at 1170–1171. The District's take on *Monahan* is simply neither the most natural nor the most persuasive one. Besides, it conflicts with the Eighth Circuit's *own* interpretation of its precedent, including in the case before us. See 96 F. 4th, at 1062, n. 2 (noting that *Monahan*'s rule was rooted in "specula[tion] that Congress intended the IDEA's predecessor to limit Section 504's protections"); see, *e. g., I. Z. M.* v. *Rosemount–Apple Valley–Eagan Public Schools,* 863 F. 3d 966, 973 (1996); *Hoekstra* v. *Independent School Dist. No. 283,* 103 F. 3d 624, 627 (1996) ("In applying a bad faith/gross misjudgment standard to §504, the *Monahan* court reasoned that such a standard harmonizes the [IDEA] and §504."). So too with the understandings of other Courts of Appeals. See, *e. g., Knox County* v. *M. Q.,* 62 F. 4th 978, 1002 (CA6 2023).

C

Perhaps sensing the likely fate of *Monahan*'s asymmetric rule, the District no longer seeks to defend it. See Tr. of

Oral Arg. 88 (stating that "the parties are in radical agreement" on the question "whether you have a different standard in the educational context" (counsel for respondents)); *id.*, at 78 (agreeing "there's no two-tier test" (same)). The District now contends instead that bad faith or gross misjudgment is "the correct standard *across the board*" for injunctive relief and damages, "both in schools and out." Brief for Respondents 2 (emphasis added). The "infirmity," the District says, is not "with *Monahan*'s original interpretation," but with "the logic of" later cases that imposed lower intent standards in other disability discrimination contexts. *Id.*, at 24.

"As a general rule," however, "we do not decide issues" that were not "resolved below" and are "outside the questio[n] presented by the petition for certiorari." *Glover* v. *United States*, 531 U. S. 198, 205 (2001). The District's position fails on both counts. A. J. T. asked us to review the "uniquely stringent 'bad faith or gross misjudgment' standard," which she characterized throughout her petition as an "arbitrar[y] depart[ure] from the more lenient standards that all courts—including the Eighth Circuit—apply to ADA and Rehabilitation Act claims brought by plaintiffs outside the school setting." Pet. for Cert. i; see also, *e. g.*, *id.*, at 32. For its part, the District never suggested at the certiorari stage that it thought this case was about anything other than the two-tiered approach set forth in *Monahan*.

We agree with A. J. T. that "it would be unfair at this point" to allow the District "to switch gears and seek a ruling from us that the standard should be" bad faith or gross misjudgment "across the board." *Norfolk Southern R. Co.* v. *Sorrell*, 549 U. S. 158, 165 (2007); see Tr. of Oral Arg. 101. We will not entertain the District's invitation to inject into this case significant issues that have not been fully presented. See *South Central Bell Telephone Co.* v. *Alabama*, 526 U. S. 160, 171 (1999); *Sorrell*, 549 U. S., at 165. The question before us "is a narrow one, and we see no need to

do more than answer that question in today's decision."  *Id.*, at 171–172.

      \*    \*    \*

That our decision is narrow does not diminish its import for A. J. T. and "a great many children with disabilities and their parents."  *Luna Perez* v. *Sturgis Public Schools*, 598 U. S. 142, 146 (2023).  Together they face daunting challenges on a daily basis.  We hold today that those challenges do not include having to satisfy a more stringent standard of proof than other plaintiffs to establish discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act.

The judgment of the United States Court of Appeals for the Eighth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE KAVANAUGH joins, concurring.

The Court's opinion correctly resolves the question presented.  I write separately to note that in an appropriate case, I would be willing to consider the additional issues raised by the respondents (collectively, the District) at the merits stage.  Although those issues were not properly before us in this case, they are important and merit our attention in the future.

We granted certiorari to decide whether Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act require disabled schoolchildren to satisfy a "uniquely stringent" standard when seeking relief under those statutes.  Pet. for Cert. i.  In other words, we took the case to decide whether Title II and Section 504 permit courts to subject one subset of plaintiffs to a higher legal standard than other plaintiffs, simply because their claims arise in the school context.  At the merits stage, both sides

agreed that the answer must be "no." Brief for Petitioner 2–3; Brief for Respondents 2; see also Tr. of Oral Arg. 78. The Court today agrees with the parties, holding that school-related claims are subject to the same legal standards as other claims. *Ante*, at 345.

At the merits stage, the District asked us to go beyond the question presented. Specifically, it urged us to clarify the particular standards that should apply in Title II and Section 504 litigation. In most courts of appeals, the operative standard for discrimination claims under these statutes turns on the kind of relief sought. To establish a violation or to obtain injunctive relief, the plaintiff need not prove intentional discrimination. *E. g.*, *Hall* v. *Higgins*, 77 F. 4th 1171, 1180–1181 (CA8 2023); *Midgett* v. *Tri-County Metropolitan Transp. Dist. of Ore.*, 254 F. 3d 846, 851 (CA9 2001). But, to obtain compensatory damages, courts generally agree that a plaintiff must prove that the defendant was at least "deliberately indifferent" to federally protected rights. *E. g.*, *Hall*, 77 F. 4th, at 1180–1181; *Silberman* v. *Miami Dade Transit*, 927 F. 3d 1123, 1134 (CA11 2019). The District challenges the no-intent standard, arguing that intent to discriminate should be required to establish a violation or to obtain any kind of relief. It presses its theory on both statutory and constitutional grounds.

To start, the District argues that the plain text of the underlying statutes prohibit only intentional discrimination. Section 504 states that individuals with disabilities shall not "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any federally funded "program or activity" "solely by reason of her or his disability." 29 U. S. C. §794(a). Title II provides that individuals with disabilities shall not, "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U. S. C. §12132. The District asserts that this statutory

language—which prohibits "discrimination" "by reason of" disability—requires a showing of intent to discriminate before a violation can be established.

Relatedly, the District contends that the underlying statutes do not permit one standard for damages and another standard for injunctive relief. Title II incorporates the "remedies, procedures, and rights set forth in [Section 504]." § 12133. And, Section 504, in turn, incorporates the "remedies, procedures, and rights set forth in title VI" of the Civil Rights Act. 29 U. S. C. § 794a(a)(2). Title VI "prohibits only intentional discrimination." *Alexander* v. *Sandoval*, 532 U. S. 275, 280 (2001); accord, *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 288–290 (2023) (GORSUCH, J., concurring). This Court has held that private individuals thus may "not recover compensatory damages under Title VI" unless they prove "intentional discrimination." *Sandoval*, 532 U. S., at 282–283. The District argues that if the incorporation of Title VI's rights and remedies requires intent for an award of damages, it should equally require intent for an award of injunctive relief. I share the District's skepticism that the same statutory language can mean two different things depending on the relief sought.

The District also raises a constitutional objection, arguing that the Constitution compels a plaintiff to prove intent to discriminate before a court may find a violation of Title II or Section 504 or award any kind of relief. See also Brief for State of Tennessee et al. as *Amici Curiae* 17–23 (arguing that constitutional considerations "weigh against Petitioner's no-intent reading" (boldface deleted)). Here too, I think the District may have a point.

Congress enacted Section 504 pursuant to the so-called Spending Clause. "We have repeatedly characterized . . . Spending Clause legislation as 'much in the nature of a *contract*: in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Barnes* v. *Gor-*

*man*, 536 U. S. 181, 186 (2002).   "Just as a valid contract requires offer and acceptance of its terms, '[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the [recipient] voluntarily and knowingly accepts the terms of the "contract." ' "   *Ibid.*   Thus, this Court has held that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."   *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981).   But, the District argues, Section 504 unambiguously covers only *intentional* discrimination; nothing in the text conveys Congress's intent to impose liability on schools for *unintentional* discrimination.

The District tells us that a no-intent violation of Title II is even more dubious.   As an initial matter, the District observes, it is unclear what constitutional authority Congress has to require a public school, by way of an injunction, to take an affirmative action such as providing additional instruction to a student.   Congress enacted the ADA under its "power to enforce the fourteenth amendment and to regulate commerce."   42 U. S. C. § 12101(b)(4).   But, the Commerce Clause does not give Congress sweeping power to protect "the learning environment" in schools.   *United States* v. *Lopez*, 514 U. S. 549, 564 (1995).   And, the Fourteenth Amendment does "not requir[e]" schools to "make special accommodations for the disabled."   *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 367 (2001).   Instead, it prohibits only conduct that lacks a rational basis, such as decisions motivated by a " 'bare . . . desire to harm.' "   *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 447 (1985).

The District contends that Title II, which targets "State [and] local government[s]," § 12131(1)(A), cannot be read to " 'compe[l]' " States to " 'expend . . . state funds' " to accommodate people with disabilities "in accordance with federal standards."   See *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. 453, 463, 476 (2018).   After all, the Constitution "has never been understood to confer upon Congress the

ability to require the States to govern according to Congress'
instructions." *New York* v. *United States*, 505 U. S. 144, 162
(1992). In the District's view, requiring a plaintiff to prove
intent to discriminate before finding a violation or award-
ing an injunction is necessary to mitigate these anti-
commandeering concerns.

I express no definitive views on the additional issues
raised by the District here. And, I agree with the Court's
decision to answer only the question presented today. See
this Court's Rule 14.1(a). But, in a case where the District's
additional issues are properly before us, I would be willing
to address them. Whether federal courts are applying the
correct legal standard under two widely utilized federal stat-
utes is an issue of national importance, and the District has
raised serious arguments that the prevailing standards are
incorrect.

Of course, this Court's resolution of these issues could have
significant ramifications for both disability law and discrimi-
nation law more generally. See Reply for Petitioner 24 (ex-
plaining that adopting the District's position would "cause a
sea change in disability law"). That these issues are conse-
quential is all the more reason to wait for a case in which
they are squarely before us and we have the benefit of adver-
sarial briefing. Until then, I hope lower courts will care-
fully consider whether the existing standards comport with
the Constitution and the underlying statutory text.

JUSTICE SOTOMAYOR, with whom JUSTICE JACKSON joins,
concurring.

I join in full the Court's opinion, which holds that ADA
and Rehabilitation Act claims regarding educational services
are subject to the same standards applied in other disability
discrimination contexts. In reaching that conclusion, the
Court rightly declines to entertain respondents' newly raised
argument that "bad faith or gross misjudgment" is the cor-
rect standard for all disability discrimination claims under

Title II and Section 504 of those Acts.   See *ante*, at 349–351.
I write separately, however, to highlight a foundational flaw
in respondents' theory.   Respondents contend that the "bad
faith or gross misjudgment" standard is appropriate because
the statutes require a showing of "improper purpose" or
"'animus.'"   Brief for Respondents 11–12, 16–17.   That is
incorrect.   The statutes' text and history, as well as this
Court's precedent, foreclose any such purpose requirement.

Recall that Title II of the ADA provides that "no qualified
individual with a disability shall, *by reason of* such disability,
be excluded from participation in or be denied the benefits
of the services, programs, or activities of a public entity, or
be subjected to discrimination by any such entity."   42
U. S. C. § 12132 (emphasis added).   The Rehabilitation Act's
similarly worded prohibition uses the same "by reason of"
language, with the modifier "solely."   29 U. S. C. § 794(a).*

That statutory language contains no reference to improper
purpose.   To the contrary, the phrase "by reason of" re-
quires no more than a causal link between the individual's
disability and her "exclu[sion] from" participating in or re-
ceiving the benefits of a covered service, program, or activ-
ity.   *Ibid.*; 42 U. S. C. § 12132.   That is the ordinary meaning
of the phrase "by reason of."   See Merriam-Webster's Dic-
tionary (11th ed. 2025), https://www.merriam-webster.com/
dictionary/by%20reason%20of (defining "by reason of" as
"because of: due to"); Merriam-Webster's Collegiate Diction-
ary 101 (10th ed. 1996) (defining "because of" as "by reason
of"); Webster's Third New International Dictionary 194
(1971) (same).   It is also the reading this Court has afforded

---

*Section 504 of the Rehabilitation Act provides: "No otherwise qualified
individual with a disability in the United States . . . shall, solely by reason
of her or his disability, be excluded from the participation in, be denied
the benefits of, or be subjected to discrimination under any program or
activity receiving Federal financial assistance or under any program or
activity conducted by any Executive agency or by the United States
Postal Service."   29 U. S. C. § 794(a).

the statutory phrase on numerous occasions. See, *e. g.*, *Husted* v. *A. Philip Randolph Institute*, 584 U. S. 756, 769 (2018) ("The phrase 'by reason of' denotes some form of causation"); *University of Tex. Southwestern Medical Center* v. *Nassar*, 570 U. S. 338, 350 (2013) (describing "'by reason of'" as another way to say "'because,'" which indicates a "'causal relationship'").

Persons with disabilities can, of course, lose access to benefits and services "by reason of," or "because of," their disabilities absent any invidious animus or purpose. Stairs may prevent a wheelchair-bound person from accessing a public space; the lack of auxiliary aids may prevent a deaf person from accessing medical treatment at a public hospital; and braille-free ballots may preclude a blind person from voting, all without animus on the part of the city planner, the hospital staff, or the ballot designer. See, *e. g.*, *Tennessee* v. *Lane*, 541 U. S. 509, 514 (2004) (Title II claim brought by paraplegic individual who was forced to "craw[l] up two flights of stairs to get to [a] courtroom"); *Liese* v. *Indian River Cty. Hospital Dist.*, 701 F. 3d 334, 338, 340–341 (CA11 2012) (Section 504 claim brought by deaf individual against hospital for failure to provide adequate methods to communicate with doctors before they performed a major surgery); *National Federation of Blind* v. *Lamone*, 813 F. 3d 494 (CA4 2016) (Title II and Section 504 claims regarding access for blind people to an absentee voting system). The statutes' plain text thus reaches cases involving a failure to accommodate, even where no ill will or animus toward people with disabilities is present.

There can be no question, too, that the statutes impose an affirmative obligation on covered entities to provide reasonable accommodations, undercutting any improper-purpose requirement. Title II of the ADA defines a "'qualified individual with a disability'" to mean an individual who, with "*reasonable modifications* to rules, policies, or practices, the removal of architectural, communication, or transportation

barriers, or the provision of auxiliary aids and services," is able to "mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U. S. C. § 12131(2) (emphasis added). A separate provision also contemplates that "a public entity under [Title] II" must provide "reasonable accommodation[s]," subject to certain exceptions. § 12201(h). For its part, Section 504 of the Rehabilitation Act makes clear that accommodations, such as architectural alterations, may be required "for the purpose of assuring program accessibility" if alternative accommodations are not available. 29 U. S. C. § 794(c). These affirmative obligations underscore that the statutes do not require improper purpose to prove liability. Entities can violate the Acts, for instance, by failing to install a wheelchair-accessible ramp, without any discriminatory animus.

The statutes' use of the passive voice ("no qualified individual with a disability shall, by reason of such disability, be excluded . . . ") only reinforces that conclusion. 42 U. S. C. § 12132; see 29 U. S. C. § 794(a). As this Court has recognized, "Congress's use of the passive voice" often indicates a "focu[s] on an event that occurs without respect to a specific actor," and therefore without respect to any actor's purpose. *Dean* v. *United States*, 556 U. S. 568, 572 (2009).

If there were any remaining doubt, the history and purpose of the statutes further confirm that Congress never intended to impose an ulterior-purpose requirement. As this Court recognized in *Alexander* v. *Choate*, 469 U. S. 287 (1985), when Congress enacted the Rehabilitation Act, it "perceived" "[d]iscrimination against the handicapped" as "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Id.*, at 295; see also *id.*, at 296 (collecting statements by legislators describing the Act as a response to "'neglect'" of the handicapped). As a result, "much of the conduct that Congress sought to alter in passing the Rehabilitation Act would

be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent." *Id.*, at 296–297. That observation applies with equal force to Title II of the ADA, which Congress modeled on Section 504. Cf. *Fry* v. *Napoleon Community Schools*, 580 U. S. 154, 159 (2017) (noting the two statutes impose the "same prohibition" on covered entities).

Consider one of the paradigmatic applications of these two laws: ensuring the "elimination of architectural barriers" to provide access for individuals with disabilities. See *Alexander*, 469 U. S., at 297 (describing this as "one of the central aims of the [Rehabilitation] Act"). Architectural barriers like stairs are rarely (if ever) "erected with the aim or intent of excluding the handicapped." *Ibid.* Yet if respondents' novel rule were the law, ADA and Rehabilitation Act claimants would have to show that a building's architect acted with "animus" toward those with disabilities in sketching out her designs. Brief for Respondents 16. It is hard to imagine any architectural-barrier claim succeeding under such a standard. Indeed, the total universe of viable claims of that nature may well be a null set. Respondents' proposed improper-purpose requirement would thus eviscerate the core of both the ADA and Rehabilitation Act, leaving millions of our fellow citizens without the protections Congress intended.

\*    \*    \*

In short, there is good reason no court of appeals has adopted respondents' eleventh-hour argument. Congress was not naive to the insidious nature of disability discrimination when it enacted the ADA and Rehabilitation Act. It understood full well that discrimination against those with disabilities derives principally from "apathetic attitudes rather than affirmative animus." *Alexander*, 469 U. S., at 296. The resulting laws reflect that understanding, and it is not the Judiciary's prerogative to override Congress's policy judgments.

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 340, line 7: "support" is changed to "supportive"
p. 340, line 15: "§ 1414(d)(1)(B)" is changed to "§ 1414(d)(1)(A)(i)(II)(bb)"
p. 358, line 3: "the" is inserted before "participation"